2020 IL App (1st) 190994

FIFTH DIVISION
NOVEMBER 20, 2020

Nos. 1-19-0994 & 1-19-1539 (consolidated)

| | | |
|---|---|---|
| *In re* MARRIAGE of | ) | Appeal from the |
| | ) | Circuit Court of |
| HEATHER BUDORICK, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 14 D2 30119 |
| and | ) | |
| | ) | |
| DANIEL BUDORICK, | ) | Honorable |
| | ) | Regina A. Scannicchio, |
| Respondent-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Hoffman and Rochford concurred in the judgment and opinion.

## OPINION

¶ 1    On March 24, 2014, petitioner-appellee Heather Budorick filed a petition for dissolution of her marriage from the respondent-appellant Daniel Budorick. After entering a judgment addressing the custody and care for the parties' minor children in December 2014, the circuit court of Cook County held a trial on all remaining issues in August and September 2018. The court entered a judgment for dissolution on November 28, 2018, and a modified judgment for dissolution on April 10, 2019. Daniel appeals from both orders, arguing that the trial court erred in (1) classifying Heather's retirement accounts from her employment in California as nonmarital property, (2) classifying and valuing Heather's shares in certain restricted stock, (3) valuing Heather's and Daniel's retirement accounts at different points in time, (4) requiring Daniel to pay $50,000 in attorney fees, (5) calculating Heather's gross income for child support purposes, (6) apportioning the payment of the parties' children's future college tuition, (7) rejecting Daniel's argument that section 513 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750

ILCS 5/513 (West 2018)), was unconstitutional as applied to him, (8) declining to find that Heather's IRA withdrawals constituted a dissipation of marital funds, (9) failing to order Heather to reimburse Daniel for half of the utility payments on their shared residence, and (10) considering Heather's second motion for reconsideration.

¶ 2    For the following reasons, we affirm in part and reverse in part the judgment of the circuit court of Cook County and remand the case for further proceedings.

¶ 3                                 BACKGROUND

¶ 4    Heather and Daniel were married on September 3, 1995, in California. Prior to their marriage, beginning in July 1991, Heather worked as a nurse for Los Angeles County USC Medical Center (USC). During her employment, Heather participated in the Los Angeles County Employees Retirement Association pension program (LACERA pension), and also contributed to a retirement plan for government employees (L.A. County 457 Plan). Her contributions to the LACERA pension occurred both pre- and post-marriage. The interest from her contributions continued to grow following the marriage. Heather took two leaves from her employment at the hospital before terminating her employment altogether on May 7, 1999. At that point, she received the funds from her L.A. County 457 Plan. In total, she was employed by USC for five years and eight months.

¶ 5    The parties had a son born in April 2000, and the family moved to Illinois in August 2001, shortly before the birth of their second son in November 2001.

¶ 6    In 2002, Heather began working for Hollister, Inc., a manufacturer of medical products. During her employment with Hollister, she participated in two retirement plans. The first plan, HolliShare, consists solely of contributions made by Hollister, while the second plan is a traditional 401(k) plan that allows for employee contributions (Hollister 401(k) Plan). Heather testified that

she is only permitted to access HolliShare funds when she ends her employment with Hollister or when she retires. In August 2002, Heather rolled over $6,663.50 from her L.A. County 457 Plan to the Hollister 401(k) Plan.

¶ 7     Also as part of her employment with Hollister, Heather was offered the opportunity to purchase stock in Hollister's parent company, John Dickinson Schneider, Inc. (JDS, Inc.). She purchased stock every year from 2007 to 2011, and then again in 2013 and 2014, with the help of funds received from her parents. In 2013, she purchased 418 shares of stock, and in 2014, she purchased 334 shares. The stock is not publicly traded; can only be held by employees, officers, and directors of Hollister or JDS, Inc.; and must be sold back to the company when an employee leaves Hollister.

¶ 8     Heather filed a petition for dissolution of marriage on March 24, 2014. In the years following the filing of the petition for dissolution of marriage, Daniel pursued litigation, related to the marriage and the petition, in federal district court, the United States Bankruptcy Court, this court, and the Illinois Supreme Court, all of which combined to delay trial on the petition for over four years until August 2018.

¶ 9     First, on March 17, 2016, Daniel filed a lawsuit against Heather's parents in federal district court, alleging, *inter alia*, conversion and a civil conspiracy with Heather to divest Daniel of marital funds to which he was entitled. The next day (and three days before trial on Heather and Daniel's divorce proceedings was scheduled to begin in state court), Daniel filed a motion in state court to remove the divorce proceedings to federal court. The federal district court promptly struck Daniel's motion for removal, *sua sponte*. Ultimately, in December 2016, on the motion of Heather's parents, Daniel's federal lawsuit was dismissed, with the district court noting that Daniel "unnecessarily multiplied the proceedings."

¶ 10    Notwithstanding this admonishment, Daniel pursued an appeal of the district court's decision to the United States Court of Appeals for the Seventh Circuit, which, in October 2017, affirmed the district court's order of dismissal and granted Heather's parents' motion for sanctions against Daniel, finding that Daniel's appeal was frivolous and "unjustified by any purpose other than to stall the divorce proceedings."

¶ 11    While his federal litigation was pending, Daniel was also pursuing relief in this court in the form of interlocutory appeals. First, in June 2016, Daniel appealed the trial court's order denying his motion to modify custody. We held that we lacked jurisdiction, dismissed the appeal, and denied Daniel's petition for rehearing. See *In re Marriage of Budorick*, 2016 IL App (1st) 161605-U. The Illinois Supreme Court denied Daniel's petition for leave to appeal on March 27, 2017.

¶ 12    On September 1, 2017, Daniel took a second interlocutory appeal to this court from the trial court's order denying his motion to stay the divorce proceedings during the pendency of his appeal of his federal lawsuit. An automatic stay was entered. On September 19, 2017, we granted Heather's emergency motion to dismiss Daniel's appeal and lifted the automatic stay.

¶ 13    Having failed to sufficiently delay the divorce proceedings through litigation in federal or state courts, Daniel turned to the United States Bankruptcy Court. On January 7, 2018, one day prior to the date on which trial was scheduled to commence in the divorce proceedings—after being rescheduled four times—Daniel filed for bankruptcy. This forced the trial court to immediately stay the divorce proceedings pending an order from the bankruptcy court.

¶ 14    On February 27, 2018, the bankruptcy court granted Heather's motion for relief from an automatic stay, allowing the trial court to reset trial for the fifth time to August 2018.

¶ 15    Daniel filed two notices of intent to claim dissipation, alleging that Heather withdrew $8,800 from a Vanguard account and $25,500 from various Roth IRA and investment accounts in

April, May, and June 2016. Daniel further alleged that Heather withdrew unspecified amounts from investments accounts between December 2014 and the time of trial.

¶ 16    At trial, the evidence revealed that Daniel was an attorney earning approximately $123,000 per year, although that fluctuated due to the amount of hours he billed in any given year. Heather's employment at Hollister earned her approximately $100,000 per year.

¶ 17    In terms of assets, Heather contributed $20,699.69 to her LACERA pension plan, of which approximately $5,753.39 was contributed after the parties' marriage. Her Hollister 401(k) Plan (into which Heather rolled over her L.A. County 457 Plan) was valued at $226,402.12 as of January 1, 2015, and $304,870.77 as of June 30, 2018. Her HolliShare account was valued at $181,381.84 as of December 31, 2013, and at $433,897.96 as of December 31, 2017. Finally, Heather's 4,652 shares of JDS stock were valued at $147,735 as of May 1, 2017. Heather's parents gifted her approximately $11,000 to purchase the JDS stock in 2013 and 2014.

¶ 18    Heather also testified as to her expenses after the filing of the dissolution petition. Specifically, she testified that in December 2016, most of 2017, and January 2018, she paid the mortgage on the family home in its entirety. Previously, Heather and Daniel had each paid half the mortgage. Heather also paid for upkeep of the family home, including purchasing a new furnace and air-conditioner and paying the real estate tax escrow shortfall.

¶ 19    Heather testified that she withdrew funds from her Hollister 401(k) Plan, a Vanguard Roth IRA, and a Fidelity Roth IRA to pay attorney fees. She further testified to withdrawing $11,423.96 from her Vanguard Small Cap Index Roth IRA between June 30, 2018, and the time of trial to pay family expenses. Her 2017 tax return revealed that she took IRA distributions of $36,556 from Fidelity and Vanguard IRAs.

¶ 20    Heather also testified that she set up and managed educational accounts for the parties' children, beginning when they were born, which were primarily funded by her parents. Daniel had no involvement in maintaining those accounts.

¶ 21    For his part, Daniel paid for the utilities on the family home in their entirety beginning at the end of 2014.

¶ 22    The court issued its judgment for dissolution of marriage on November 28, 2018. In its memorandum opinion, the court found that Daniel made limited to no contributions to the marital assets during the divorce proceedings. Specifically, the court found that while Daniel contributed to his 401(k) plan during the pendency of the proceedings, this was offset by his borrowing $50,000 against the 401(k) plan to pay personal loans he had incurred. Further, the court found that Daniel's actions were detrimental to the family's finances because of his delay tactics in the divorce proceedings. The court found that Heather, on the other hand, continued her work at Hollister during the divorce proceedings and received regular pay raises. She also contributed to her 401(k) plan and received additional HolliShares as a result of her employment.

¶ 23    With these findings in mind, the court ordered that all marital assets owned by the parties be split 50/50, including Heather's HolliShares and Hollister 401(k) plan. However, the court valued Heather's Hollister retirement accounts as of the date closest to the date Heather filed for divorce, rather than the date of trial. It valued Daniel's 401(k) plan as of the date of trial.

¶ 24    The court determined that Heather's LACERA pension was nonmarital property, finding that Daniel had failed to present evidence of marital contributions to that fund. The court further found that Heather was entitled to reimbursement from the marital estate of the rollover amount from her L.A. County 457 Plan as that was likewise her nonmarital property.

¶ 25    With regard to the JDS stock, the court found that Heather used gifted funds to purchase the stock in 2013 and 2014, but marital funds to purchase the stock in the five years between 2007 and 2011. Therefore, the court determined that Heather's JDS stock was 2/7 nonmarital and 5/7 marital. Given that the stock was valued at $147,375 in December 2017, the court awarded $42,107 (2/7 of the total amount) to Heather and divided $105,268 (5/7 of the amount) between Daniel and Heather evenly.

¶ 26    The court also held that if the education accounts created by Heather were insufficient to pay for the children's college education, the costs for education should be paid 2/3 by Daniel and 1/3 by Heather.

¶ 27    The court declined to award maintenance, finding that the parties were self-sufficient. However, the court ordered Daniel to pay $1,300 per month in child support to Heather. In calculating Heather's gross income for child support purposes, the court excluded the funds in her HolliShare account and also excluded Heather's IRA withdrawals. In that same vein, the court rejected Daniel's claim that Heather dissipated marital funds by withdrawing money from her IRA account. The court found that Heather used that money to pay family expenses and attorney fees.

¶ 28    Finally, the court ordered Daniel to pay $50,000 of Heather's attorney fees with his share of the proceeds from the sale of the parties' family home. The court explained that its award was not based on the parties' ability to pay, but on the fact that Daniel "has done everything in his power to delay and stall this case from being tried," which resulted in an "exponential[ ] increase[ ]" in the cost of this litigation to Heather.

¶ 29    Daniel moved to reconsider the judgment in December 2018, as did Heather. However, Heather withdrew her motion prior to ruling.

¶ 30    The court entered a modified judgment on April 10, 2019, rejecting all of Daniel's contentions of error with the exception of its ruling on attorney fees. The court held that Daniel was required to pay $50,000 in attorney fees for Heather, but this payment did not need to come from Daniel's share of the proceeds from the sale of the marital residence.

¶ 31    Also in April 2019, the bankruptcy court quashed a subpoena to Hollister and found that the trial court awarded Daniel a money judgment rather than actual shares of JDS stock. In response to Daniel's motion for reconsideration, the bankruptcy court affirmed its finding that Daniel had a right only to the value of the JDS stock and not an award of JDS stock. The bankruptcy court ultimately entered an order of discharge.

¶ 32    Meanwhile, in the trial court, on May 6, 2019, Heather moved to clarify and amend the April 10, 2019 modified judgment for dissolution of marriage. Notwithstanding Heather's motion pending in the trial court, Daniel filed a notice of appeal on May 10, 2019, of the court's November 28, 2018, and April 10, 2019, orders.

¶ 33    On June 24, 2019, the trial court granted Heather's motion to clarify and amend its prior order entered on April 10, 2019. The trial court's order corrected a scrivener's error that ascribed the $6,663.50 rollover amount to JDS stock rather than to Heather's L.A. County 457 Plan and also clarified the date by which Daniel's contribution to Heather's attorney fees was due.

¶ 34    Daniel then appealed from the trial court's June 24 order. We granted Daniel's motion to consolidate the appeals.

¶ 35                                        ANALYSIS

¶ 36    We note that we have jurisdiction to review this matter, as Daniel filed a timely notice of appeal following the modified judgment for dissolution. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017).

¶ 37                         A. Heather's California Retirement Accounts

¶ 38    Daniel's first argument concerns the trial court's classification of Heather's LACERA pension and L.A. County 457 Plan. Specifically, Daniel contends that the trial court erroneously found both accounts were Heather's nonmarital property.

¶ 39    All property of the parties to a marriage belongs to either the husband's estate, the wife's estate, or the marital estate. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 68. The trial court must classify all property as either marital or nonmarital before dividing the property between the parties. 750 ILCS 5/503(a) (West 2018). We will not disturb a trial court's classification of property unless it is against the manifest weight of the evidence. *In re Marriage of Lundahl*, 396 Ill. App. 3d 495, 504-05 (2009). A trial court's finding is against the manifest weight of the evidence where it is clearly apparent from the record that the trial court should have reached the opposite conclusion or where the finding is arbitrary, unreasonable, or not based on the evidence. *In re Marriage of Dhillon*, 2014 IL App (3d) 130563, ¶ 29.

¶ 40    The Act defines marital property as all property acquired by either spouse subsequent to the marriage. 750 ILCS 5/503(a) (West 2018). The Act goes on to list exceptions which are known as nonmarital property. *Id.* Among those exceptions are "property acquired before the marriage, except as it relates to retirement plans that have marital and nonmarital characteristics." 750 ILCS 5/503(a)(6) (West 2018).

¶ 41    Retirement plans are further addressed in subsection (b)(2) of the Act, which provides "all pension benefits (including *** defined benefit plans, defined contribution plans and accounts,

individual retirement accounts, and non-qualified plans) acquired by or participated in by either spouse after the marriage and before a judgment of dissolution of marriage *** are presumed to be marital property." 750 ILCS 5/503(b)(2) (West 2018). That presumption may be overcome by showing through clear and convincing evidence that the property was acquired by a method listed in subsection (a)(1). *Id.*; *id.* § 503(a)(1). It is the burden of the party who claims the property is nonmarital to rebut the presumption. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 51. Any doubts as to the classification of the property will be resolved in favor of finding that the property is marital property. *Id.*

¶ 42    Turning first to Heather's LACERA pension, it is undisputed that Heather's initial contributions to the pension plan began prior to the marriage and were nonmarital. What is disputed is whether she contributed to the plan after marriage. Such contributions would presumptively be marital (see 750 ILCS 5/503(b)(2) (West 2018)) and would have the effect of commingling marital and nonmarital property. The trial court determined that Daniel failed to present evidence that Heather made contributions to the pension plan with marital funds. We agree with Daniel that this finding was against the manifest weight of the evidence.

¶ 43    Heather introduced an exhibit detailing her contributions to LACERA by date. That exhibit reflects that Heather made at least 18 contributions to the pension plan post-marriage, totaling approximately $5,800. The exhibit further reflects that the pension continued to grow in value following those postmarital contributions.

¶ 44    Because the trial court erroneously concluded that Daniel failed to show marital contributions to the pension, the court did not grapple with section 503(c), which explains how commingled marital property should be treated:

"If marital and non-marital property are commingled by one estate being contributed into the other, the following shall apply:

(i) If the contributed property loses its identity, the contributed property transmutes to the estate receiving the property, subject to the provisions of paragraph (2) of this subsection (c);

(ii) If the contributed property retains its identity, it does not transmute and remains property of the contributing estate.

***

(2)(A) When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation." 750 ILCS 5/503(c) (West 2018).

The court also did not consider how much of the increase in value of the pension was attributable to the nonmarital versus marital contributions. We decline to undertake this analysis for the first time on appeal and instead remand the case to the trial court to determine whether the contributed marital property lost its identity and transmuted to the nonmarital estate; whether the contributing estate is entitled to reimbursement; and what portion of the increase in value of the pension is marital versus nonmarital property. See *In re Marriage of Raad*, 301 Ill. App. 3d 683, 687-88 (1998) (where trial court erred in characterizing pension plan profits as marital property, remanding to the trial court to determine what portion of increase in value of petitioner's pension was marital versus nonmarital property and determine right of reimbursement). In making this determination, the trial court should consider Heather's Exhibit 18(a), which was duly admitted during trial and which evidences Heather's postmarital contributions to the pension plan at issue.

¶ 45    Turning to Heather's L.A. County 457 Plan, Daniel contends that this, too, was erroneously classified as nonmarital property. At trial, Heather testified that she received the 457 funds when she left her employment with USC in 1999, after the parties' marriage. As such, pursuant to subsection 503(b)(2) of the Act, this was presumptively marital property. See 750 ILCS 5/503(b)(2) (West 2018) (retirement benefits acquired by either spouse after marriage is presumed marital property); see also *In re Marriage of Zamudio*, 2019 IL 124676, ¶ 19 ("acquired," as ordinarily and popularly understood, means gaining possession or control of).

¶ 46    It was Heather's burden to rebut this presumption with clear and convincing evidence that she contributed to the retirement fund with nonmarital property. See 750 ILCS 5/503(a)(6). The sole basis by which Heather maintains that the entirety of her L.A. County 457 Plan fund was nonmarital property was her affirmative response at trial to her counsel's question during her testimony regarding whether she had "some retirement funds from a 457 plan prior to marriage." There is no documentary evidence in the record reflecting either when or how much she contributed to the plan. The only evidence as to the amount in the L.A. County 457 Plan is a statement from Cigna (the Hollister 401(k) Plan administrator), indicating that Heather rolled over $6,663.50 into her Hollister Incorporated Supplemental Retirement plan in August 2002. While oral testimony may establish clear and convincing evidence under certain circumstances (see *In re Marriage of Henke*, 313 Ill. App. 3d 159, 168 (2000)), "the bare assertion of a nonmarital *source* of a particular sum of money, without supporting documentary evidence such as account records, deposit slips, canceled checks, *etc.*, cannot be deemed clear and convincing." (Emphasis in original.) *In re Marriage of Didier*, 318 Ill. App. 3d 253, 262 (2000).

¶ 47    Here, we conclude that Heather's perfunctory, affirmative response to a leading question by her counsel as to the nonmarital source of the funds in the L.A. County 457 Plan did not amount

to clear and convincing evidence. It was a self-serving statement uncorroborated by any other evidence. In fact, Heather's testimony that she continued to work at USC following the parties' marriage, calls that testimony into doubt. As such, the trial court's characterization of the L.A. County 457 Plan retirement fund as Heather's nonmarital property was against the manifest weight of the evidence. See *Stuhr*, 2016 IL App (1st) 152370, ¶ 51 (doubts as to classification of property should be resolved in favor of finding property is marital). Accordingly, we hold that the $6,663.50 is marital property to be divided between the parties in accordance with the trial court's 50/50 ruling as to division of marital property and that Heather is not entitled to reimbursement of that amount from the marital estate.

¶ 48                                    B. JDS Stock

¶ 49     Daniel challenges the trial court's division of Heather's JDS stock on multiple grounds; we consider each in turn. First, Daniel argues that the trial court awarded him actual shares of JDS stock, rather than the stock's value. But the trial court's memorandum of judgment reflects the contrary. The trial court found that Heather's JDS stock was "2/7 non-marital and 5/7 marital." The court then went on to state:

> "The value provided by the company was as of May 18, 2018 indicating that the stock was worth $147,375 as of December 31, 2017, the latest valuation date. Accordingly, 2/7 of that amount ($42,107) shall be assigned to Heather as her nonmarital property, and 5/7 ($105,268) shall be deemed marital property to be divided equally between Heather and Daniel."

And in the "orders" portion of its judgment, the court reiterated: "Heather's JDS stock valued at $147,375 shall be divided $52,634 to Daniel and the remainder to Heather. This assigns to Heather 2/7 of the value of the stock as her non-marital portion, and divides the remaining 5/7 into two

equal shares allocating 50% to each party." Nowhere did the court's judgment identify the number of shares Heather owned or otherwise suggest that its award was of shares as opposed to money.

¶ 50    To the extent Daniel argues that the court *should* have awarded him actual stock, we disagree. The evidence at trial revealed that JDS stock was "essentially non-transferable." The shares are required to be sold to JDS, Inc. upon termination of the shareholder's employment, and the only persons who can own or hold common shares of JDS Inc. are "employees of JDS Inc., Hollister or their controlled corporations; officers and directors of JDS Inc. or Hollister who have performed substantial and continuing services for either corporation; employee deferred benefit plans such as HolliShare; and The Firm of John Dickinson Schneider, Inc. Preferred Share Trust April 21, 1999."

¶ 51    *In re Marriage of Schlichting*, 2014 IL App (2d) 140158, is instructive. There, the trial court found that the petitioner's interest in an LLC was marital property and ordered her to sell a portion of her interest to the respondent. *Id.* ¶ 44. This contravened the LLC's operating agreement, which prohibited a member from selling a membership interest in the absence of unanimous consent of the other members. *Id.* ¶ 5. We reversed the trial court's decision on appeal, explaining that

> "[w]hile no Illinois case *requires* a court to distribute marital property in accordance with an operating agreement binding one or both of the parties in their business activities, existing case law, both within and outside Illinois, comes together to establish that the failure to do so, where compliance is easily possible, constitutes an abuse of discretion." *Id.* ¶ 60. (Emphasis in original.)

¶ 52    Pursuant to *Schlichting*, had the trial court in this case ordered Heather to turn over the shares of stock to Daniel, it, too, would have abused its discretion, where the court could easily

comply with Heather's employer's guidelines prohibiting her from transferring the stock to anyone outside of the specified corporate entities by awarding Daniel his share of the stock's *value*, rather than the stock itself.

¶ 53    Daniel's arguments that the court should have used a Qualified Domestic Relations Order (QDRO) to turn over the stock shares to him or divide the stock in accordance with a "reserved jurisdiction" approach, are likewise unavailing. With regard to Daniel's argument that the court should have used a QDRO to effectuate its order dividing the JDS stock, it is premised on the assumption that the trial court awarded Daniel shares of JDS stock and not merely the value of the stock. Because we have already concluded that the court's order entitled Daniel only to the cash value of the stock, we will not address this argument further.

¶ 54    We note that the reserved jurisdiction approach that Daniel advocates is used in situations where an asset's present value is difficult to determine because of uncertainties surrounding when it will vest or mature. *In re Marriage of Peters*, 326 Ill. App. 3d 364, 371 (2001). In such a scenario, the court will delay dividing the asset and order only *how* it will be divided *if and when* it is paid out. *Id.* Needless to say, that is not the case here. The present value of Heather's JDS stock is in no way uncertain. It is actual stock that Heather currently owns, not a stock option that may or may not mature. Therefore, the reserved jurisdiction approach to dividing the asset is wholly inapplicable to this situation.

¶ 55    Next, Daniel argues that the court erred in finding that the stocks purchased in 2013 and 2014 were nonmarital property. As noted *supra*, a trial court's classification of property as marital or nonmarital will generally not be disturbed on appeal unless it is against the manifest weight of the evidence. *Lundahl*, 396 Ill. App. 3d at 504-05. However, where, as here, the facts are not in

dispute, we review the trial court's classification of property *de novo*. *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 819 (2007).

¶ 56    Subsection 503(b)(3) of the Act addresses the distribution of stock options and restricted stock, providing that:

> "[A]ll stock options and restricted stock or similar form of benefit granted to either spouse after the marriage and before a judgment of dissolution of marriage or legal separation or declaration of invalidity of marriage, whether vested or non-vested or whether their value is ascertainable, are presumed to be marital property. *This presumption of marital property is overcome by a showing that the stock option or restricted stock or similar form of benefit were acquired by a method listed in subsection (a) of this Section.*" (Emphasis added.) 750 ILCS 5/503(b)(3) (West 2018).

Subsection (a) of section 503 defines nonmarital property, which list includes "property acquired by gift, legacy or descent or property acquired in exchange for such property." 750 ILCS 5/503(a)(1) (West 2018).

¶ 57    Under the Act, the JDS stock was presumptively marital property as it was purchased during the marriage. See 750 ILCS 5/503(b)(3) (West 2018). However, Heather testified that her 2013 and 2014 stock purchases were made with gifted funds from her parents, thereby rebutting the presumption. See *id.* On appeal, Daniel does not argue that Heather failed to prove that she purchased the stock in 2013 and 2014 with gifted funds from her parents. Rather, he suggests that subsection 503(a)(1) does not apply to purchases of restricted stock—*i.e.,* that all restricted stock or stock options granted to a spouse after marriage is, without exception, marital property. He cites no authority for this proposition, which is clearly contradicted by the plain language of the statute.

We therefore conclude that the trial court properly found that Heather's 2013 and 2014 JDS stock purchases were her nonmarital property.

¶ 58    In a related argument, Daniel maintains that even if the trial court properly classified the 2013 and 2014 stock purchases as nonmarital property (and, implicitly, the 2007-2011 stock purchases as marital property), the trial court erred in awarding Heather 2/7 of the present value of the JDS stock, rather than awarding her the present value of the *shares* she purchased with gifted funds.

¶ 59    Initially, Heather responds that Daniel waived this argument by failing to include it in his docketing statement. It is sufficient to note that the docketing statement requires only a general statement of the issues proposed to be raised by the parties and the failure to raise an issue in the docketing statement will not result in the waiver of the issue on appeal. *In re Marriage of Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 17 (citing *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 177-78 (2011)).

¶ 60    Turning to the merits, we agree with Daniel that the trial court erroneously calculated $42,107 of the stock value to be nonmarital property. The evidence revealed that Heather owned 4,652 shares of stock at the time of trial that was valued, as of December 31, 2017, at $147,735, or $31.75 per share. Heather did *not* show that $42,107 (2/7) of the present stock value was traceable to gifts from her parents. Rather, the evidence showed that she purchased 752 shares of JDS stock with gifted funds. The value of those 752 shares (the nonmarital property) was $23,876, not $42,107. The remaining 3,900 shares (the marital property) had a value of $123,499 (not $105,268). The trial court's conclusion that $105,268 of the stock value was marital property was therefore a miscalculation. Daniel is therefore entitled to 50% of $123,499, or $61,912.50, not $52,634.

¶ 61                    C. Valuation of HolliShare and Heather's Hollister 401(k)

¶ 62    The trial court valued Heather's HolliShare account and Heather's Hollister 401(k) funds

as of the date closest to March 24, 2014, when Heather filed her petition for dissolution. However,

the court valued Daniel's 401(k) funds as of June 2018, the date closest to trial. Daniel maintains

this was error, and the court should have valued all retirement accounts as of the date closest to

trial.[1]

¶ 63    Subsection 503(f) of the Act, as amended in 2016, provides that in determining the value

of marital or nonmarital property for purposes of property division, the trial court "has the

discretion to use the date of the trial or such other date as agreed upon by the parties, or ordered

by the court within its discretion." 750 ILCS 5/503(f) (West 2018). But the trial court's discretion

is not unfettered. Specifically, the court must be consistent in setting a valuation date.

¶ 64    Here, the trial court's decision to value Heather's Hollister retirement assets as of a

different date than Daniel's retirement assets was based primarily on the court's finding that

Daniel's actions in delaying and stalling the proceedings were detrimental to the family's financial

well-being. To be sure, pursuant to subsection 503(d) of the Act, in dividing marital property, the

trial court may consider, *inter alia*, "each party's contribution to the acquisition, preservation, or

increase or decrease in value of the marital or non-marital property" *and whether the contribution*

*is after proceedings for dissolution have commenced.* 750 ILCS 5/503(d)(1)(iii) (West 2018).

Significantly, however, this is a factor that the court may use to determine the *division* of marital

---

[1]Daniel also suggests that by valuing Heather's retirement accounts in 2013 and 2014, the court somehow found the subsequent increase in the value of those accounts was Heather's nonmarital property. It is sufficient to note that there is no support in the record for this contention. The trial court's order describes the increase in value as "Heather's sole and separate property," not "non-marital property."

property, not the fixing of a *date of valuation* of that property. In other words, inconsistent valuation dates cannot be used as a substitute for sanctions for frivolous behavior. Therefore, we reverse the court's findings valuing Heather's and Daniel's retirement assets as of different dates. We remand the case for the court to use the same valuation date for those assets of Heather and Daniel that were subject to different valuation dates and to divide said assets in accordance with the factors listed in subsection 503(d) of the Act, which includes the court's discretion.

¶ 65                                    D. Attorney Fees

¶ 66    Daniel maintains that the trial court erred in requiring him to contribute $50,000 to Heather's attorney fees. We review a trial court's fee award in dissolution proceedings for an abuse of discretion. *In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶ 68. A court abuses its discretion where it acts arbitrarily or exceeds the bounds of reason and ignores recognized principles of law such that no reasonable person would take the view adopted by the court. *In re Marriage of Paris*, 2020 IL App (1st) 181116, ¶ 43 (citing *In re Marriage of Levinson*, 2013 IL App (1st) 121696, ¶ 34)).

¶ 67    Subsection 508(a) of the Act provides that a court, *after considering the financial resources of the parties*, may order any party to pay for his own or the opposing party's costs and attorney fees. 750 ILCS 5/508(a) (West 2018).[2] The section further states that contribution to fees from the opposing party may be awarded in accordance with section 503(j). *Id.* Section 503(j), in turn, provides that an award of fees in response to a petition for contribution to fees and costs shall be

_____

[2]Attorney fees may also be awarded irrespective of a party's ability to pay where a party fails to comply with court orders or precipitates a hearing for an improper purpose. See 750 ILCS 5/508(b) (West 2018); *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 122. Here, however, Heather's counsel explicitly denied that he brought the fee petition under subsection 508(b).

based on the criteria for division of marital property set forth under section 503(d)(1)-(12). *Id.* § 503(j) (West 2018).

¶ 68    The trial court in this case cited subsections 508(a) and 503(j) of the Act in its order. Our supreme court recently reaffirmed the principle that an award of fees pursuant to subsection 508(a) of the Act depends on the petitioning party's inability to pay. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 19. The court explained that the inability to pay does not mean that payment of the fees would leave the party destitute, but that payment would "undermine his or her financial stability." *Id.* Here, the court made no finding that Heather was unable to pay her own fees. To the contrary, the court specifically stated in its original order that the award was "not based on the ability of the parties to pay." The court's "clarifying" statement in its amended memorandum of judgment that it had taken into account the parties' employment, earnings, retirement benefits, and debts in making its award is not tantamount to an implicit finding that Heather could not pay her attorney fees. This is particularly true in light of the court's earlier explicit statement that it did not consider the parties' inability to pay in rendering its award.

¶ 69    In sum, there are two bases on which to award attorney fees in dissolution proceedings: subsections 508(a) and 508(b) of the Act. Heather expressly denied bringing her fee petition under subsection 508(b) of the Act, and the court did not award fees under subsection 508(a) because it explicitly stated that the award was "*not based on the ability of the parties to pay.*" Further, in its ruling, the court made it clear that the basis of its fee award was in response to Daniel's dilatory tactics in the dissolution proceedings and *was not* based on either subsection 508(a) or subsection 508(b) of the Act. Because the court's fee award was not based on any applicable section of the Act, we conclude that the court abused its discretion in ordering Daniel to contribute $50,000 to

Heather's attorney fees. Therefore, we reverse that portion of the court's order. See *Paris*, 2020 IL App (1st) 181116, ¶ 20 (abuse of discretion to ignore recognized legal principles).

¶ 70                                    E. Child Support

¶ 71    Daniel argues that the court erred in calculating Heather's income for child support purposes where it excluded the funds in her HolliShare account and Heather's IRA withdrawals. Subsection 505(a)(1.5) of the Act provides guidelines for calculating child support obligations, beginning by requiring the court to determine each parent's monthly net income, which is defined as gross income minus certain deductions. 750 ILCS 5/505(a)(1.5)(A), (a)(3)(B) (West 2018). Income, in turn, is "any form of periodic payment to an individual, regardless of source," including wages, salary, pension, profit-sharing payments, and retirement benefits. 750 ILCS 28/15(d) (West 2018). Ordinarily, the trial court's findings as to net income are subject to review for an abuse of discretion. *In re Marriage of Vance*, 2016 IL App (3d) 150717, ¶ 34. But here, Daniel challenges the court's interpretation of "income" under the Act, requiring *de novo* review. See *In re Marriage of McGrath*, 2012 IL 112792, ¶ 10.

¶ 72    Turning first to the HolliShare account, Daniel characterizes this as a profit-sharing account. But the evidence of the characteristics of the account belies this contention. Unlike a traditional profit-sharing account, HolliShare funds are only accessible by employees when they leave Hollister or retire. In other words, Heather cannot receive these funds as a current employee of Hollister. And because these funds were never paid to Heather, the trial court properly excluded them as income for child support purposes. See 750 ILCS 28/15(d) (West 2018) (income is periodic *payment* to individual).

¶ 73    Heather's IRA disbursements present a closer question. Initially, the parties dispute whether there was evidence in the record as to these disbursements. Daniel, citing Heather's tax

returns, contends that Heather withdrew $81,292 from various IRA accounts between 2015 and 2017. Heather responds that her 2015 and 2016 tax returns were never introduced into evidence. While the returns are in the record as "Petitioner Exhibit 1," the report of proceedings does not reflect that they were introduced at trial. Daniel does not argue otherwise, but maintains that his $81,392 figure is supported by Heather's testimony. We disagree. While Heather generally testified that she used funds withdrawn from her Roth IRAs to pay attorney fees, there was no evidence as to the amount of the withdrawals or the date the withdrawals were made, making it impossible for the trial court to include them as income.[3]

¶ 74    There is, however, some duly admitted evidence of Heather's IRA withdrawals from her 2017 tax return. That return reflects a $36,556 distribution to Heather from a Fidelity and Vanguard IRA in 2017.

¶ 75    There is a split in appellate authority as to whether IRA withdrawals constitute income. See *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶¶ 59-71 (collecting cases). (As of 2012, the supreme court has declined to settle this question. *In re Marriage of McGrath*, 2012 IL 112792, ¶ 10 n.2.) Under *de novo* review, the Second District has held that IRA disbursements constitute income for child support purposes, reasoning that such disbursements are money received from an investment, which falls under the plain and ordinary meaning of income. *In re Marriage of Lindman*, 356 Ill. App. 3d 462, 466 (2005) (citing *In re Marriage of Rogers*, 213 Ill. 2d 129, 136-37 (2004)). However, the court explained that IRA disbursements could be excluded

---

[3]Daniel also suggests that this court can consider the fact that Heather's 2015 and 2016 tax returns were attached as exhibits to his motion for reconsideration. But exhibits to pleadings are not evidence. *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 21 (generally, document must be offered by proponent and admitted into evidence by the trial court before it may be considered as evidence).

from income if they were "double counted," positing a scenario in which the court calculates a party's child support obligation using income that has been contributed to an IRA in year one and withdrawn from the IRA in a subsequent year. *Id.* at 470. In other words, the money could be counted both on its way into and out of the IRA. *Id.* To avoid double-counting, the court suggested that a trial court would have to determine the percentage of the IRA deposit it considered in calculating income in year one and discount the later year net income calculation accordingly. *Id.*

¶ 76    In considering the husband's motion to modify child support using an abuse of discretion standard of review, the First District, citing *Lindman*, affirmed the trial court's finding that the respondent's IRA withdrawals constituted income. *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 232-33 (2008).

¶ 77    The Fourth District, on the other hand, reviewing for an abuse of discretion, affirmed the trial court's finding that the respondent's IRA withdrawal was *not* income when considering his petition to modify child support. *In re Marriage of O'Daniel*, 382 Ill. App. 3d 845, 850 (2008). The court compared an IRA to a savings account because it is ordinarily self-funded by the person possessing the account:

> "The money the individual places in an IRA already belongs to that individual. When an individual withdraws money he places into an IRA, he does not gain anything as the money was already his. Therefore, it is not a gain and not income. The only portion of the IRA that would constitute a gain for the individual would be the interest and/or appreciation earnings from the IRA." *Id.*

Because the petitioner in that case did not present evidence as to what portion of the respondent's IRA withdrawal consisted of his contributions, the court could not determine what portion was income for child support purposes. *Id.*

¶ 78    Most recently, in addressing this issue in a petition to modify support, the Second District suggested that *Lindman* and *O'Daniel* are not in "absolute conflict." *Verhines*, 2018 IL App (2d) 171034, ¶ 65. The court explained that *Lindman* held that IRA withdrawals are income after subtracting for "double counting" and *O'Daniel* suggests that IRA interest and appreciation could also constitute income. *Id.* Thus, "both *Lindman* and *O'Daniel* allow for the possibility that a portion of IRA withdrawals would constitute income." *Id.*

¶ 79    We agree with the premise that, notwithstanding the split of authority, all courts agree that at least some portion of IRA withdrawals may constitute income. We follow *O'Daniel* and conclude that IRA disbursements of interest, not principal, are income for purposes of calculating child support.

¶ 80    In this case, the trial court's basis for finding that Heather's IRA withdrawal did not constitute income was because "those funds are spent." We struggle to follow the trial court's reasoning for that conclusion. Presumably, Heather had also spent her 2015-2017 salary, but the trial court nevertheless considered Heather's salary in determining an amount for her average income. Thus, the trial court's reasoning for excluding the entire $36,556 IRA withdrawal in its income calculation for Heather is without support and requires us to remand the case to the trial court to determine *what portion* of that withdrawal, *if any*, was attributable to *interest* earned on Heather's IRA investment. The trial court must then recalculate the applicable child support amount accordingly. If the trial court cannot determine whether the distribution taken by Heather from her IRA is principal or interest, then it should consider the withdrawal on a *pro rata* basis, calculated on the ratio of principal to interest in the IRA at the time of the distribution.

¶ 81                      F. Contribution to Educational Expenses

¶ 82    Daniel challenges both the trial court's decision to apportion responsibility for the parties' children's college education between the parties as well as the actual apportionment of that responsibility. Initially, Daniel contends that the trial court erred in addressing the payment of the children's college education expenses in the first place because neither party filed a petition asking the court to do so. Section 513 of the Act allows the court to "award sums of money out of the property and income of either or both parties *** as equity may require, for the educational expenses of any child of the parties." 750 ILCS 5/513(a) (West 2018). Nowhere in this section is a formal, stand-alone petition required before a court may make such an award. In her petition for dissolution, Heather asked that a "determination be made as to the college education of the children." This was clearly sufficient to put the matter properly before the court for consideration.

¶ 83    Daniel next argues that the court erred in requiring Heather to pay one-third of any expenses not covered by the children's existing educational accounts, while Daniel must pay two-thirds. In awarding educational expenses for adult children, the court should consider (1) the present and future financial resources available to the parties, (2) the standard of living the child would have enjoyed had the parents remained married, (3) the child's financial resources, and (4) the child's academic performance. *Id*. § 513(j)(1)-(4). We review a section 513 award for an abuse of discretion. *In re Marriage of Cianchetti*, 351 Ill. App. 3d 832, 837 (2004).

¶ 84    In this case, Daniel challenges the court's consideration of the first factor, contending that the court "ignored" the parties' financial resources in rendering its decision. To the contrary, the record reveals that the court carefully considered the parties' current and future income. In particular, the court noted that although Daniel currently earned only $20,000 more than Heather, prior to Heather's filing of the divorce petition, he often earned over two times as much as she did, demonstrating his increased earning potential. Indeed, Daniel testified at trial that he expected to

receive more hours from his employer that would bring his salary closer to prefiling levels. Given that the court also split the parties' retirement accounts evenly, we cannot say the court abused its discretion in requiring Daniel to contribute more to the children's college education. See *Paris*, 2020 IL App (1st) 181116, ¶ 20 (abuse of discretion occurs where trial court's decision exceeds the bounds of reason).

¶ 85                                G. Constitutionality of Section 513

¶ 86    Daniel repeats the long rejected argument that section 513 of the Act is unconstitutional as applied to him because it treats married and divorced parents differently by imposing on divorced parents an obligation to pay for their children's college education without imposing a similar responsibility on married parents. The Illinois Supreme Court rejected this argument in 1978, holding that allowing the trial court discretion to require divorced parents to pay for their children's college educations served the "legitimate legislative purpose" of minimizing "any economic and educational disadvantages" to children of divorced parents. *Kujawinski v. Kujawinski*, 71 Ill. 2d 563, 580 (1978). Therefore, it concluded that section 513 did not violate the equal protection clause. *Id.* Daniel maintains that "social changes" since 1978 lessen the force of this reasoning, but even if we agreed, we have no authority to depart from supreme court precedent. See *Yakich v. Aulds*, 2019 IL 123667, ¶ 13 (holding that trial court was bound to follow *Kujawinski* and lacked authority to find section 513 unconstitutional as applied to respondent).

¶ 87                                        H. Dissipation

¶ 88    Dissipation occurs when a spouse uses marital property for his or her benefit, for a purpose unrelated to the marriage, at the same time the marriage is suffering from an irreconcilable breakdown. *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 779 (2007). The Act requires a party claiming dissipation to file a timely "notice of intent," which must identify the property

dissipated as well as the date or period of time when the dissipation occurred. 750 ILCS 5/503(d)(2) (West 2018). The complaining spouse must make a *prima facie* case for dissipation before the burden shifts to the spouse charged with dissipation to demonstrate, with clear and convincing evidence, how the funds were spent. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 65. If the spouse cannot show that the funds were spent for a legitimate family expense, the court must find dissipation. *In re Marriage of Asher-Goettler*, 378 Ill. App. 3d 1023, 1031 (2008). We will not disturb a trial court's finding with regard to dissipation unless it is against the manifest weight of the evidence. *Id.*

¶ 89    On appeal, Daniel argues that Heather dissipated $92,609 from "IRA accounts." He provides no explanation or record citations to explain how he reached this figure, but his notices of intent to seek dissipation offer some guidance. Specifically, in his first notice of intent, filed on May 9, 2017, he alleged that Heather had withdrawn (1) $8,800 from her Vanguard account, (2) an "undetermined [amount]" from her Fidelity account between December 2014 and December 2015, and (3) undetermined amounts from her Vanguard and Fidelity accounts between January 2016 and the present. The second notice of intent was more specific, alleging that Heather had withdrawn (1) $10,500 from a Roth IRA account ending in 9094 in May 2016, (2) $5,000 from a Fidelity account ending in 470 in April 2016, and (3) $10,000 from a Fidelity Roth account ending in 292 in June 2016.

¶ 90    The trial court concluded that "Daniel's dissipation claims have not been proven in that Heather accounted for all funds [asserted] by Daniel that she used from her accounts[,]" finding that Heather used the funds to pay "family expenses and attorney fees." Daniel argues that this was error because using marital funds to pay attorney fees constitutes dissipation under the law. See *In re Marriage of Weiler*, 258 Ill. App. 3d 454, 464 (1994). Heather responds that Daniel did not

make a *prima facie* case of dissipation in the first instance, so the burden did not shift to her to prove that the funds were not used for an improper purpose. We agree. (While the trial court rejected Daniel's dissipation claim on the basis that Heather rebutted it with clear and convincing evidence, we may affirm the judgment on any basis in the record. See *Taylor, Bean, & Whitaker Mortgage Corp. v. Cocroft*, 2018 IL App (1st) 170969, ¶ 60.)

¶ 91     At trial, Daniel failed to introduce account statements or other evidence in support of his claims of dissipation. Replying to Heather's argument regarding his failure to make a *prima facie* case on appeal, Daniel only cites Heather's testimony that she withdrew $10,000 from her "Hollister 401k" to pay attorney fees and that she withdrew an unspecified amount from a Fidelity IRA. He also cites to testimony that Heather withdrew $36,556 from an IRA in 2017. But he made no attempt to tie these withdrawals to those he alleged in his notices of intent to claim dissipation. Indeed, at trial, he did not elicit testimony from Heather regarding the dates of either the Hollister 401(k) fund or the Fidelity IRA withdrawals.[4] Under these circumstances, we conclude that Daniel failed to set forth a *prima facie* case of dissipation. As such, the trial court properly rejected his claim.

¶ 92                     I. Reimbursement of Utility Payments

¶ 93     Daniel argues that the trial court erred in failing to order Heather to reimburse him for the payment of utilities on the marital residence, which he allegedly paid in full beginning in 2014. In June 2015, Daniel petitioned Heather for contribution to household expenses, including utilities.

---

[4]To the extent the record contains more specific evidence of dates or amounts of Heather's alleged liquidation of marital assets, Daniel failed to point us to it. Parties may not treat this court as a repository for facts and arguments that are not supported by specific and accurate record citations. *Travaglini v. Ingalls Health System*, 396 Ill. App. 3d 387, 405 (2009). It is not this court's responsibility to "scour the record in search of facts that support the argument being advanced by a party." *Id.*

The record does not reveal that the trial court ever ruled on this petition. Then, in Daniel's written closing argument following trial, he asked the court to order Heather to reimburse him for half of the utility payments he made on the marital residence. However, the trial court's judgment again did not address the issue of reimbursement for utility payments. Thus, there was no ruling on that issue. When Daniel subsequently filed his motion for reconsideration of the trial court's rulings, *he did not bring this omission to the court's attention*. As a result, the court's order on reconsideration did not address utility payment reimbursement. Daniel now complains that it was error for the trial court to fail to address this issue.

¶ 94    It is well-settled that the party filing a motion has the responsibility to bring it to the attention of the trial court. *Jackson v. Alvarez*, 358 Ill. App. 3d 555, 563 (2005) (collecting cases). Where the moving party fails to do so, and it appears no ruling has been made on the motion, it is presumed the motion was waived or abandoned. *Id.* Here, because Daniel failed to press the trial court for ruling on his original motion for contribution to utility payments, in spite of opportunities to do so, we see no reason to address the merits of that motion for the first time on appeal. See *id.* at 564 (where plaintiff did not seek a ruling on her motion to file an amended complaint in trial court, reviewing court declined to address motion on appeal).

¶ 95                                    J. Motion for Reconsideration

¶ 96    Before addressing the merits of Daniel's argument with respect to Heather's motion for reconsideration, it is helpful to begin with a detailed timeline of events following the November 28, 2018 entry of judgment.

¶ 97    On December 28, 2018, both parties filed motions for reconsideration pursuant to section 2-1203 of the Illinois Code of Civil Procedure, permitting parties in nonjury cases to file a motion for rehearing or modification of judgment within 30 days of the entry of that judgment. See 735

ILCS 5/2-1203(a) (West 2018). In Heather's motion, she asked the court to correct two scrivener's errors in its judgment and also sought clarification of the portion of the court's order requiring her to turn over to Daniel $52,634 in JDS stock. Specifically, she asked the court to provide "specific direction" for how she should turn over this amount, given Daniel's pending bankruptcy proceedings and the fact that the stock proceeds may belong to the bankruptcy estate or creditors. Heather ultimately withdrew this motion prior to the court's ruling on April 1, 2019.

¶ 98     The court ruled on Daniel's motion for reconsideration on April 10, 2019. In its ruling, the court expressly noted that Heather had withdrawn her motion for reconsideration regarding how (and to whom) the JDS stock value was to be transferred and therefore declined to address that issue.

¶ 99     On May 6, 2019, Heather moved to clarify and amend the court's April 10 order, asking the court to correct a scrivener's error and also include a date by which Daniel's contribution to Heather's attorney fees were due. In addition, Heather asked the court to offset the value of JDS stock she owed to Daniel against the attorney fees Daniel owed to her.

¶ 100  On June 24, 2019, the trial court granted Heather's motion to clarify the judgment, corrected the scrivener's error, and ordered Daniel to pay Heather's attorney by September 23, 2019. The court did not rule on Heather's argument for offset.

¶ 101  On appeal, Daniel argues that successive posttrial motions are not allowed. He further argues that redundant motions seeking to delay appeals are likewise disallowed. Both arguments are meritless. Illinois Supreme Court Rule 274 expressly provides that where a final judgment—such as the November 28, 2018, order—is modified pursuant to a postjudgment motion, any party affected by the order may make a postjudgment motion directed at that superseding order. Ill. S. Ct. R. 274 (eff. Oct. 14, 2005). The court modified its November 28 order on April 10, 2019;

Heather was affected by that modified order; and she timely filed a postjudgment motion. Pursuant to Rule 274, that motion was not successive.

¶ 102   Nor was Heather's May 6 postjudgment motion in any way duplicative or redundant of her withdrawn December 28, 2018, motion. The latter asked the court for clarification as to how to turn over the JDS stock value, while the former sought to offset that value against the attorney fees that were pending. For these reasons, Daniel's arguments relating to the court's consideration of Heather's second postjudgment motion fail.

¶ 103                                            CONCLUSION

¶ 104   For the foregoing reasons, we make the following findings:

   1. Heather's postmarital contributions to the LACERA pension were marital property. On remand, the trial court should determine to what extent the growth in that pension fund was attributable to marital versus nonmarital contributions; whether the marital property transmuted to nonmarital property; and whether the marital estate was entitled to reimbursement.

   2. The L.A. County 457 Plan fund was marital property. On remand, the trial court should divide it between the parties accordingly.

   3. Heather was not entitled to two-thirds of the value of the JDS stock as her nonmarital property. On remand, the trial court should use the value of the shares Heather purchased with gifted funds to calculate the portion of the value of the stock that is Heather's nonmarital property.

   4. Valuing Heather's and Daniel's retirement assets at different times was error. On remand, the court should value the assets as of the same time period and divide the assets in accordance with subsection 503(d) of the Act.

5. The court erred in concluding that the totality of Heather's 2017 IRA withdrawals was not income to her for child support purposes. On remand, the court should recalculate Heather's income, including only that portion of her 2017 IRA withdrawal that was attributable to interest earned on her IRA investment, if any, to determine the parties' child support payments.

6. The record does not establish support for the court's ruling that Heather was entitled to $50,000 in attorney fees from Daniel.

The court's judgment is affirmed in all other respects.

¶ 105    Affirmed in part, reversed in part, and remanded with directions.

---

**No. 1-19-0994**

---

| | |
|---|---|
| **Cite as:** | *In re Marriage of Budorick*, 2020 IL App (1st) 190994 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-D2-30119; the Hon. Regina A. Scannicchio, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Daniel Budorick, of Chicago, appellant *pro se*. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Thomas J. Dillon, Wendy Kaleta Gattone, Nicholas S. Maragos, and Kyle T. Dillon, of McFadden & Dillon, P.C., of Chicago, for appellee. |

---